**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**United States Securities and Exchange**
**Commission,**

                               **Case No. C2-CV-04-739**
                               **JUDGE GREGORY L. FROST**
          **Plaintiff,**         **MAGISTRATE JUDGE ABEL**

     **v.**

**Bradley T. Smith, et al.,**

             **Defendants.**

**OPINION & ORDER**

In this securities fraud action, Plaintiff United States Securities and Exchange

Commission ("SEC") alleges that Defendants Bradley T. Smith ("Smith"), Continental Midwest

Financial, Inc. ("Continental"), and Scioto National, Inc. ("Scioto") violated the Securities Act

of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), and the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § § 78u(d) and 78u(e), in connection with two private offerings of

Continental and Scioto's common stock.  (Doc. # 58).  The SEC has moved for summary

judgment on all of its claims.  (Doc. # 48).  Because the parties have completed their briefing,

the Court now turns to an examination of the summary judgment motion.

## I.    BACKGROUND

The facts relevant to deciding this motion are surprisingly simple.

## A.    RELEVANT PARTIES & ENTITIES

Smith specializes in small community bank stocks and holds himself out to the public as

an expert in the same.  Smith resides in Columbus, Ohio and conducts his business in Dublin,

Ohio.  His business primarily consists of establishing and operating private companies whose stated purpose is to serve as vehicles for investors to buy small community bank stocks.  Smith is the President and CEO of BancShares First, Inc. ("BancShares First"), a broker-dealer registered with the National Association of Securities Dealers ("NASD").  BancShares First is not a Defendant in this action.  (Smith Dep. 167).

Continental is a Florida corporation with its principal place of business in Dublin, Ohio. Continental, which Smith founded in 2002, is in the business of investing in financial services companies and small banks located primarily in the Midwest.   Smith is the Chairman, President, Treasurer, and sole director of Continental.   Smith therefore controlled Continental.  *Id.* at 170.

Defendant Scioto National, Inc. ("Scioto") is also a Florida corporation with its principal place of business in Dublin, Ohio.  Smith founded Scioto in 2004 and, like Continental, Scioto is in the business of investing in financial services companies and small banks located primarily in the Midwest.  Smith is the Chairman, President, Treasurer, and sole director of Scioto.  *Id.*

Relief Defendant Bancshareholders of America ("Adviser") is an investment advisor registered in Ohio.  The Adviser is a Florida corporation with its principal place of business in Dublin, Ohio.  Smith founded the Adviser in 1998, and Smith is the Adviser's President and is also a part-owner of the Advisor.  *Id.*  The Adviser has two clients: the Community Bank Stock Equity Trust ("Trust") and the Bankstock Investment Partners Series # 1, L.P. ("Partnership").

Relief Defendant Bancshares Investors Brokerage, Inc. ("BSIB") is a Florida corporation with its principal place of business in Dublin, Ohio.  Smith founded BSIB in 2001 and is BSIB's Chairman, President, Treasurer and sole director.

**B.**     **THE OFFERINGS**

Smith has established seven new businesses since 1999. Four of those businesses have conducted private offerings of securities since 2002: Continental, the Trust, the Partnership, and Scioto. Those offerings raised approximately $3.3 million. The Court is only concerned with the Continental and Scioto offerings.

1.      **CONTINENTAL**

Continental held a private offering ("Continental Offering") of its common stock between July 2002 and September 2003. In connection with the offering, Smith prepared copies of a private offering memorandum ("Continental POM") which was dated July 22, 2002 and distributed to investors. (Doc. # 48 Ex. A). The Continental POM stated that the purpose of the offering was to raise a maximum of $2.27 million to invest in "financial services companies and minority interests in small banks located primarily in the Midwest." *Id.* According to the memorandum, 80% of the offering's proceeds would be invested in small bank stocks. *Id.*

Smith and his employees also provided potential investors with copies of Continental's Business Plan ("Continental Business Plan") before they invested. (Smith Dep. 269, 306-310). Similar to Continental's POM, Continental's Business Plan stated that Continental planned to use 81% of the $2,272,500 it planned to raise from the offering to "build a community bank stock portfolio" and to use $350,000 for "working capital." (Doc. # 48 Ex. B). Smith testified at his deposition that he intended "working capital" to refer to general administrative and operating expenses for Continental only. (Smith Dep. 278).

Smith and his employees conducted the sale which raised $1,272,665 from 49 investors. (Doc. # 48 Ex. H-1). Smith, as an individual and as Continental's Chairman, President, Treasurer, and sole director, admits that he used the proceeds from the offering in a manner

3

contrary to the Continental POM's representations. For example, Smith used some of the proceeds to pay his credit card bill, which included charges for men's clothing, nutritional supplements, and a dating/escort service. (Doc. # 64 at 32; Doc. # 48 Ex. H). Moreover, Smith spent $133,532.38 in Continental investor funds to pay for the Adviser's bills. (Doc. # 48 Ex. H ¶ 25). Additionally, Smith used the proceeds to pay himself and his employees, and to pay taxes and rent for Smith's offices. (Doc. # 64 at 10). Smith and his employees did not tell Continental investors that their money would be used to pay the expenses of Smith's other businesses or to cover Smith's personal expenses. (Smith Dep. 320-321, 394).

All told, only 9% of the proceeds were used to purchase small back stocks, in contrast to the 80% the represented in the Continental POM. (Francis Decl. ¶ 24). In fact, 85% of the proceeds were used to cover other expenses of Smith's businesses. (Doc. # 48 Ex. H ¶ 26). Eventually, all of the investments were liquidated. (Smith Dep. 288). As of June 30, 2004, the Continental investments were worth approximately $10,000. After the SEC filed this lawsuit in August 2004, Smith resigned his position as an officer and director of Continental. (*See* Doc. # 20 at 8).

### 2.    SCIOTO

Since January 2004, Scioto has conducted a private offering of its common stock ("Scioto offering"). Similar to the Continental offering, Smith provided each potential investor with a private offering memorandum dated January 9, 2004 ("Scioto POM") and other marketing materials that Smith drafted. (Doc. # 48 Ex. C). The Scioto POM establishes that the purpose of the private offering is to raise money to invest in "financial services companies and minority interests in small banks located in the Midwest." *Id.* Further, the Scioto POM states that a

4

maximum of $1,008,000 would be raised and that approximately 70% of the proceeds would be used to "purchase ... stock in small banks." *Id.* The Scioto POM further provides that $230,000 would be used for working capital. *Id.* Smith intended that amount to be applied to the general administrative and operating expenses of Scioto only. (Smith Dep. 347-348). Smith decided how much of the money that came in from the Scioto offering would be used to pay bills or would be invested in bank stock. *Id.* at 344.

The Scioto offering has raised $822,852 from 29 investors. (Francis Dec. ¶ 29). Approximately $170,000 or 21% of those proceeds have been transferred into investment account. (Francis Dec. ¶ ¶ 29, 31). However, Smith spent $503,208 of Scioto investor funds on expenses of Smith's other businesses. (Doc. # 48 Exs. H, K). Furthermore, Scioto spent $86,092 for Smith's personal use, including $41,499 in salary. (Francis Dec. ¶ 33). As August 17, 2004 there was only $3,392.94 in Scioto's bank account. (Doc. # 48 Ex. H-2). After this lawsuit was filed, Smith resigned his position as an officer and director of Scioto, but has yet to pay back Continental and Scioto for his personal expenses that he charged to the companies' American Express card. (*See* Doc. # 20 at 8; Smith Dep. 370-371).

## C.    THE CLAIMS

The SEC's Second Amended Complaint first asserts that Smith, Continental, and Scioto made material misrepresentations of fact in the Continental and Scioto POMs and marketing materials regarding the way in which the proceeds from the Continental and Scioto offerings would be used in violation of Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act. (Doc. # 58 at ¶ ¶ 34-41). Next, the SEC alleges that Smith, Continental, and Scioto violated Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b5, 17 C.F.R. § 240.10b-5,

thereunder. *Id.* at ¶ ¶ 42-45. Third, the SEC asserts that Smith is a control person of Continental and Scioto, and is therefore liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.* at ¶ ¶ 46-48. Lastly, the SEC alleges that under Section 20(e) of the Exchange Act Smith aided and abetted Continental and Scioto's violations of Section 10b of the Exchange Act and Rule 10b-5 thereunder. *Id.* at ¶ ¶ 49-52. Defendants deny all of the SEC's claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

6

that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

### III. DISCUSSION

**A.   THE ANTI-FRAUD PROVISIONS:  SECTION 17(a)(1) OF THE SECURITIES ACT, SECTION 10b OF THE EXCHANGE ACT, AND RULE 10b-5 THEREUNDER.**

The SEC first alleges that Smith, Continental, and Scioto ("Defendants") violated Section 17(a)(1) of the Securities Act. (Doc. # 58 at ¶ ¶ 34-38). Section 17(a) provides:

> It shall be unlawful for any person in the offer or sale of any securities ...
> by the use of any means or instruments of transportation or
> communication in interstate commerce or by use of the mails, directly or
> indirectly--
> (1) to employ any device, scheme, or artifice to defraud . . .

15 USCS § 77q(a). The Defendants utilized the United States mails to provide investors with the POMs and marketing materials at issue. (Smith Dep. 271, 334).

Moreover, the SEC alleges that the Defendants violated Section 10(b) of the Exchange Act, which makes it unlawful for any person, directly or indirectly:

> To use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered, or
> any securities-based swap agreement . . . , any manipulative or deceptive device
> or contrivance in contravention of such rules and regulations as the Commission
> may prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j(b). The SEC also asserts that the Defendants violated Rule 10b-5, which

implements Rule 10b and makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish violations of these anti-fraud provisions, the SEC must show that the Defendants: (1) engaged in misrepresentations or omissions of material facts; (2) made in connection with the offer, sale or purchase of securities; (3) with scienter on the part of the defendants. *SEC v. Thorn*, 2005 U.S. App. LEXIS 19117, at **14-15 (6th Cir. 2005) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)).

### 1. Misrepresentations or omissions of material facts.

The SEC maintains that the Defendants, through the Continental POM, Scioto POM, and associated marketing materials, misrepresented how they were going to use the funds raised from the private offerings. (Doc. # 48 at 14) Specifically, the SEC states that the Continental POM and Scioto POM each contained a separate section setting forth the estimated use of the proceeds that represented that "the bulk of the proceeds would be used primarily to buy stock in small Midwestern banks." *Id.* Defendants, while not disputing that they did not use the money raised from the offering in the manner set forth in the POMs, counter that those statements were a "mistake" that they corrected through oral statements to investors. (Doc. # 64 at 13). Defendants continue that the POMs were not used to sell the securities because Defendants did not provide investors with copies of the POMs until after the investors had made their

8

investments. *Id.*

Because Defendants admit that they did not spend the money they raised from the private offerings in the manner delineated in the POMs and marketing materials, the threshold issue is whether the alleged misrepresentations were material. (Doc. # 64 at 13; Doc. # 48 Exs. A-D). A fact is material if a substantial likelihood exists that a reasonable shareholder would (1) consider the fact important in making his investment decision and (2) view the information as having significantly altered the total mix of information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Certainly, a reasonable investor would consider how the Defendants would actually spend his money were he to invest to be an important factor when determining whether to invest in the Defendants' offerings. The United States Court of Appeals for the District of Columbia Circuit, in affirming the trial court's grant of summary judgment in a securities fraud case, noted that it was obvious to the trial court that a reasonable investor would consider misrepresentations concerning the use of funds to be important–"that is, a reasonable investor would not have invested in ... a project which diverted substantial funds to the personal use of the promoter." *United States SEC v. Better Life Club of Am., Inc*., 1999 U.S. App. LEXIS 7319, at *7 (D.C. Cir. 1999). Likewise, the Court concludes here that it is obvious that a reasonable investor would consider it important to know that his money would not be invested in bank stock but would instead be used for other purposes, such as to pay for Smith's American Express bill, car washes, dating services, and the expenses of Smith's other companies in which the investors did not have any investment interests. (Doc. # 48 Ex. H-2). Moreover, that omission would have substantially altered the total mix of information–that is, the omitted fact would have assumed

9

actual significance in the deliberations of the reasonable investor.   For certain, a reasonable investor would have considered Smith's omission that the majority of funds raised from the offerings would be spent on Smith's personal items and expenses for his other businesses instead of small bank stock a significant factor in determining whether to invest in the offerings.  *Id.* at Exs. H, H-1, H-2.  *See Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 214 (6th Cir. 1984). As such, the SEC has established the first element.

      **2.      In connection with the purchase or sale of securities.**

      Defendants posit that the misrepresentations in the POMs and relevant marketing materials were not "in connection with the purchase and sale of securities" because Defendants did not provide investors with those materials until after the investors bought the securities. (Doc. # 64 at 13-19).  Essentially, Defendants argue lack of reliance.  And, to the extent any investor received the POMs and marketing materials before deciding to invest in the offerings, Defendants maintain that they "corrected" the misstatements in those materials through oral statements from their salesmen.  *Id.*  at 19-26.  In response, the SEC proclaims that it need not establish reliance and that the Defendants' alleged oral representations do not negate the written representations contained in the POM.  (Doc. # 69 at 3).  The SEC's arguments prevail.

      To begin, the Continental and Scioto offerings involved common stock.  Stocks are securities.  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10); *Landreth Timber v. Landreth*, 471 U.S. 681, 686 (1985).

      The Supreme Court defers to the SEC's  broad interpretation of  the "in connection with" requirement.  *SEC v. Zandford*, 535 U.S. 813, 819 (2002).  To that end, the Supreme Court instructs lower courts to inquire whether the deceptive practices "touch" the sales of securities.

*United States v. Russo*, 74 F.3d 1383, 1391 (2d Cir. 1996) (citing *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971)).  In this instance, the answer is undoubtedly yes for two reasons.

First, Smith testified at his deposition that each and every investor got a copy of the relevant POM and marketing materials with their stock certificates.  (Smith Dep. 271, 334).  The stock certificates represent the securities the investors purchased.  Accordingly, the material misrepresentations contained within the POM and marketing materials obviously "touched" the sale of those securities.

Second, the POMs set out the rights and obligations of the purchaser and issuer.  The agreements signed by each Continental and Scioto representative explicitly refer to the governing POM, stating that upon acceptance of the subscription, "the Company shall be entitled to receive the entire amount of the subscription price, and to utilize and apply such amounts for the purpose specified in the Memorandum."  (Doc. # 48 Ex. CC).   The stated purpose of the offerings contained in the Continental and Scioto POMs was to: "invest in . . . small banks located primarily in the Midwest."  (Doc. # 48 Exs. A, C).  Similarly, each POM provided that the nature of Continental and Scioto was to "invest most of the proceeds of this offering in stock of less actively traded independent community banks located primarily in the Midwest."  *Id.*

In addition, Defendants' argument that the misrepresentations within the POMs and marketing materials were not "in connection with" the sale of the securities at issue because the investors did not receive those materials until after they had purchased the stock is partially incorrect as well as misplaced.  Smith first testified at his deposition that he provided potential investors with the Continental Executive Summary that contained the same representations as the

11

Continental POM about how the proceeds from the offering would be used *before* they invested. *Id.* at 269, 309-310; Berry Dep. 82-84, 109-110.  Also, many investors who bought Continental stock also purchased Scioto stock.  (Doc. # 69 at Exs. BB, V, Y).  Hence, those investors would have had the POM and marketing materials after their first purchase and before any subsequent purchases.  *Id.*  However, Smith later testified that he did not provide the investors with the materials until after they had purchased the securities, when he mailed the materials to them along with their stock certificate.  (Smith Dep. 271-272, 334).

Regardless, the record is clear that the investors did receive a copy of the relevant POMs and marketing materials at some point.  The point in time in which the investors received those materials need not have been before they purchased the security–indeed, the Sixth Circuit held that the SEC does not need to establish that any investor relied on the misrepresentations in the POMs and the marketing materials in order to bring a fraud action.  *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) (holding "whether or not investors detrimentally relied upon Blavin's misstatements is not material to the present suit. Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money").  Defendants' reliance argument is therefore unavailing.

Lastly, Defendants were unable to orally correct the misrepresentations contained within the POMs and marketing materials relative to how the Defendants would spend the money from the offerings.  Smith admitted that he controlled Continental and Scioto and that he himself prepared the POMs for those offerings.  (Smith Dep. 170; Doc. # 69 Exs. M, N, O).  The POMs specifically provided that "no person has been authorized to give any information or to make any

12

representations not contained in this Offering Memorandum, the Subscription Agreement or any other documents accompanying this Offering Memorandum and, if give or made, such information or representation must not be relied upon." (Doc. # 69 Exs. A, C). In turn, the Subscription Agreements provide that they "may not be amended or terminated except by writing signed by the party against whom such an amendment or termination is sought." *Id.* at Exs. CC, HH. Because Smith prepared those documents, he knew that any oral statements would be insufficient to correct the misrepresentations in the POMs and associated documents. Additionally, basic principles of contract law become applicable because of the alleged conflict between the written and oral representations; specifically, the written statement controls the oral one and the law presumes reasonable investors rely on written materials, not on oral representations. *See Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 786 (7th Cir. 1992); *Brown v. E.F. Hutton Group*, 735 F. Supp. 1196, 1202 (S.D. NY 1990). Those principles further show that the POMs and associated documents control in this instance.

Because the Defendants' admitted misrepresentations were "in connection" with the purchase or sale of Continental and/or Scioto securities, the SEC has satisfied the second element of its burden.

**3.    Scienter**

The third and final element of an anti-fraud claim is that Defendants acted with scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 at n.12 (1976). Sixth Circuit precedent establishes that the SEC may establish scienter by producing proof of recklessness–"highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach v. Prescott, Ball &*

13

*Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979).

Defendants contend that the SEC is unable to establish scienter because: (1) Smith acted with good faith to build the businesses; (2) Defendants accounted for the use of the proceeds from the offerings in their books; and (3) Smith made a mistake in the POMs about how the money would be spent.  (Doc. # 64 at 26-56).  The SEC correctly counters that there is more than enough evidence to establish that the Defendants' actions were reckless.  (Doc. # 69 at 17-19).

At the time of the offerings, Smith knew that Continental and Scioto would not be using the proceeds in the manner set forth in the POMs, Executive Summaries, and other marketing materials–namely, to invest the majority of the proceeds in small bank stocks.  (Doc. # 69 Exs. M, N, O).  Despite this fact, Smith distributed those materials–which he drafted and reviewed–with the misrepresentations to investors.   (Doc. # 48 Exs. M, N, O; Smith Dep. 269, 271-272, 309-310, 321, 334).   Indeed, Smith used the Continental POM as a template for the Scioto POM, so he could have corrected the Scioto POM before distribution or issued amended POMs.  (Smith Dep. 330). For whatever reason, then, Smith knew about the misrepresentations but elected to do nothing to correct them. This, in the Court's view, equates to highly unreasonable conduct which is an extreme departure from the standards of ordinary care.

Remarkably, Smith admits that he used some of the proceeds from the offerings for personal expenses.  (Doc. # 64 at 32).  The record demonstrates that he spent $37,548.86 from the Continental and Scioto proceeds to pay off American Express charges for personal items such as clothing, car washes, a dating service, skin care products, and candles.  (Doc. # 48 Exs. H-1, H-2).  Smith also spent $7,410.64 of Continental investor funds to pay for his house payment.  (Doc. # 48 Ex. H-1 at ¶ ¶ 36, 37).  According to the Sixth Circuit, Smith's admission

14

that he spent investor funds on personal expenses "establishes the requisite state of mind for committing securities fraud"–recklessness.  *SEC v. Thorn*, 2005 U.S. App. LEXIS 19117, at * *25-26 (6th Cir. 2005).   And, Smith's scienter is imputed to Continental and Scioto because he controlled those companies.  *SEC v. Manor Nursing Centers, Inc*. 458 F.2d 1082, 1089 at n.3 (2nd Cir. 1972).

Smith also recklessly spent 85% of Continental investor funds and 61% of Scioto investor funds on other business expenses.  (Doc. # 48 Ex. H ¶ ¶ 26, 33).  In contrast, Smith only spent 9% of the Continental funds and 21% of the Scioto funds on small bank stocks, as opposed to the 81% of Continental funds and 69% of Scioto funds that the POMs indicated would be spent. *Id.*

Smith's assertion that he acted in good faith to build the businesses and that the companies hired an accountant in May 2004 to prepare the companies' books for an external audit does nothing to change the Court's holding that the Defendants acted recklessly.  (Doc. # 64 at 26, 36).   These arguments miss the mark, as the relevant inquiry is whether Defendants recklessly made material misstatements or omissions about how the investors' funds would be used in connection with the purchase or sale of securities.  As set forth above, the answer to that question is yes, and the Court **GRANTS** the SEC's motion for summary judgment on the Section 17(a)(1), Section 10b, and Rule 10b-5 claims.[1]

_____

[1] The Court is aware that granting summary judgment is generally disfavored when state of mind issues are present.  However, Smith's admissions coupled with the vast evidence of reckless conduct convince the Court that summary judgment is necessary and warranted in this instance.  Furthermore, the Court notes that this Court has previously granted summary judgment on the same issue and that the Sixth Circuit affirmed those decisions.  *See SEC v. Thorn*, 2005 U.S. App. LEXIS 19117 (Aug. 30, 2005); *see also SEC v. Midwest Investments, Inc*., 1996 U.S. App. LEXIS 14424 (May 6, 1996).

**B.      SECTIONS 17(a)(2) and 17(a)(3) OF THE SECURITIES ACT**

The SEC also asserts that Defendants violated Sections 17(a)(2) and 17(a)(3) of the

Securities Act.  Those sections provide:

> (a) Anti-fraud and anti-manipulation enforcement authority. It shall be unlawful
> for any person in the offer or sale of any securities or any security-based swap
> agreement (as defined in section 206B of the Gramm-Leach-Bliley Act [15 USCS
> § 78c note]) by the use of any means or instruments of transportation or
> communication in interstate commerce or by use of the mails, directly or
> indirectly– ...
> (2) to obtain money or property by means of any untrue statement of a material
> fact or any omission to state a material fact necessary in order to make the
> statements made, in light of the circumstances under which they were made, not
> misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or
> would operate as a fraud or deceit upon the purchaser.

15 USCS § 77q.  Under these subsections, scienter is not required and culpability is established

merely by a showing of negligence.  *See Aaron v. Securities & Exchange Comm'n*, 446 U.S. 680,

695-699 (1980);  *Meadows v. SEC*, 119 F.3d 1219, 1226 at n.15 (5th Cir. 1997);  *United States

SEC v. Midwest Invs*., 1996 U.S. App. LEXIS 14424, No. 94-3433, at *21 (6th Cir. 1996)

(unreported).  Put simply, the SEC's burden is to establish that the Defendants negligently made

material misrepresentations or omissions of material fact in connection with the sale or purchase

of Continental and/or Scioto securities.  *SEC v. Solucorp Indus*., 274 F. Supp. 2d 379, 419

(D.N.Y. 2003) (holding that the SEC can establish a violation of Sections 17(a)(2) or (a)(3) by

showing merely that the statement was materially false and misleading and that defendants

negligently caused those misrepresentations or omissions) (citing *SEC v. Scott*, 565 F. Supp.

1513, 1525-26 (S.D.N.Y. 1983)).  Consequently, the Court's task in determining whether the

Defendants violated Sections 17(a)(2) and 17(a)(3) of the Securities Act is made simple by the

Court's holding above that the Defendants acted recklessly in making misrepresentations of material facts in connection with the two offerings–because Defendants acted recklessly they necessarily acted negligently. *See SEC v. TLC Invs. & Trade Co.*, 179 F. Supp. 2d 1149, 1155 (C.D. Cal. 2001). The SEC's motion for summary judgment on its claims under Sections 17(a)(2) and 17(a)(3) is **GRANTED**. (Doc. # 48).

## C.      CONTROL PERSON

The SEC also pursues a claim under Section 20(a) of the Exchange Act against Smith.[2] Specifically, the SEC alleges that Smith is liable as a control person for Continental and Scioto's violations of Section 10b and Rule 10b-5 thereunder of the Exchange Act. (Doc. # 58 at ¶ ¶ 46-48). Section 20(a) extends liability to:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

---

[2] The Sixth Circuit stated:
Without deciding the question, we note that some authority suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) and Rule 10b-5 claims and Section 20(a) claims against the same defendant. 'Arguably, a § 20(a) claim cannot be asserted against a defendant who is also charged with primary violation of § 10(b) and Rule 10b-5; that is, secondary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b-5.' *Lemmer v. Nu-Kote Holding, Inc.*, 2001 U.S. Dist. LEXIS 13978, No. CIV. A. 3:98-CV-0161-L, 2001 WL 1112577 at * 12 (N.D. Tex., Sept. 6, 2001) (citing *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) (suggesting that plaintiffs could not allege primary liability against the directors of a corporation and at the same time allege control person liability against the directors)).

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 697 at n.4 (6th Cir. 2004). Given the Sixth Circuit's decision to abstain on the issue, the lack of case law on point within the circuit, and Smith's failure to raise the question as to whether the SEC may assert a claim under Section 20(a), the Court will permit the SEC to go forward with its Section 20(a) claim.

person to whom such controlled person is liable, unless the controlling person
acted in good faith and did not directly or indirectly induce the act or acts
constituting the violation or cause of action.

15 USCS § 78t(a).

Initially, the Court must determine whether the SEC may assert that Smith violated

Section 20(a) while also seeking injunctive relief in light of the Sixth Circuit's holding in *SEC v.*

*Coffey*, 493 F.2d 1304 (6th Cir. 1974). In that case, the Sixth Circuit held that "Section 20(a) of

the 1934 Act may not be relied upon by the SEC in an injunctive enforcement action" because

that section "makes a controlling person liable 'to any person to whom such controlled person is

liable'" and the SEC is not a person. *Id.* at 1318 (citing 15 USCS § 78t(a)). After that decision,

however, Congress amended the definition of "person" in the Exchange Act to specifically

include governmental entities. 15 U.S.C. § 78(c)(a)(9). As a result, the Second Circuit held in

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996), that "since § 20(a) is available as an

enforcement mechanism to 'any person to whom such controlled person is liable,' and the 1934

Act includes government agencies in the definition of 'person,' *see* 15 U.S.C. § 78c(a)(9), we

have upheld the SEC's authority to pursue an enforcement action under § 20(a)." *Id.* at 1472.

The current weight of authority from courts around the country is that the Second Circuit's

position on this issue is the correct one. *See, e.g., SEC v. Buntrock*, 2004 U.S. Dist. LEXIS 9495,

at *27-28 (D. Ill. 2004); *SEC v. Enterprises Solutions, Inc.*, 142 F. Supp. 2d 561, 575 (S.D.N.Y.

2001); *SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1029 (N.D. Cal. 2001). In light of the

congressional amendment to the definition of "person" and the Second Circuit's holding in *First*

*Jersey*, the Court agrees with those courts and holds that the SEC may pursue an enforcement

action pursuant to Section 20(a) against Smith.

18

According to the Sixth Circuit, the SEC must prove three elements to establish its Section 20(a) claim against Smith.  First, Smith "must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-697 (6th Cir. 2004).  Second, Smith must have directly or indirectly controlled the entity liable for the securities law violation.  *Id.*  "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2.  Third, and finally, because "controlling person" liability is derivative the SEC may hold Smith liable under this theory only if Smith controlled an entity that violated the Exchange Act.  *Darby v. Century Bus. Servs*., 96 Fed. Appx. 277, 286 (6th Cir. 2004) (Exchange Act); see also *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 1001 (6th Cir. 2005) (Securities Act).

Each of the three requirements are satisfied here.  To begin, the Court held above that Smith, Continental, and Scioto violated the Securities Act and the Exchange Act.  Moreover, Smith admitted that he is the founder, chairman, treasurer, and sole director of both Continental and Scioto.  (Smith Dep. 167, 170-71, 183-185, 192, 202, 208; Doc. # 48 Exs. M, N, O).  Smith further admitted that he was responsible for making the financial decisions for Continental and Scioto, and that he drafted the POMs at issue, and that he was the control person for the offerings.  *Id.*; Doc. # 79 at ¶ ¶ 1, 47-48.  Therefore, Smith undoubtedly controlled Continental and Scioto and is liable as a control person under Section 20(a) of the Exchange Act.  Additionally, Smith's assertion of good faith in traveling and working hard to build up the businesses is once again meritless because the relevant issue is that he recklessly made

19

misrepresentations in connection with the sale and purchase of securities–specifically, that the majority of the proceeds from the offerings would be spent on small bank stocks when in fact the majority was spent on personal items and expenses for Smith's other businesses.   (See Doc. # 48 Exs. H, H-1, H-2).   Thus, Court **GRANTS** the SEC's motion for summary judgment on the SEC's claim under Section 20(e) of the Exchange Act.  (Doc. # 48).

**D.     AIDING AND ABETTING**

Lastly, the SEC alleges that Smith violated Section 20(e) of the Exchange Act by aiding and abetting Continental and Scioto's violations of Section 10b and Rule 10b-5 of the same act. (Doc. # 58 at ¶ ¶ 49-52).  A claim of aiding and abetting violations of Section 10b and Rule 10b-5 of the Exchange Act requires proof that the accused party knowingly and substantially assisted another party's violation of the securities law, and that the accused had a general awareness that it was participating in an overall improper activity.  *Sanders Confectionery Prods. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992) (citing *Moore v. Fenex, Inc.*, 809 F.2d 297 (6th Cir.), cert. denied, 483 U.S. 1006 (1987)); *see also Coffey*, 493 F.2d at 1316.

Smith maintains that he made a mistake in writing the POMs–specifically, Smith argues that the POMs should have stated that the majority of the proceeds from the offerings would be spent on operation costs of his other businesses to further Smith's plan to consolidate them and not on purchasing small bank stocks.  (Doc. # 64 at 13, 17, 47; Doc. # 48 Exs. M, N, O).  If true, Smith would not have knowingly aided and abetted the Continental's and Scioto's violations of the Securities Act and the Exchange Act.  A genuine issue of material fact therefore exists as to whether Smith knowingly assisted in Continental and Scioto's violations of securities law.  As a result, the Court **DENIES** the SEC's motion for summary judgment on its claim under Section

20

20(e) of the Exchange Act.[3]  (Doc. # 48).

**E.      THE SEC'S MOTION TO STRIKE DOCUMENTS ATTACHED TO DEFENDANTS' MEMORANDUM IN OPPOSITION**

The SEC moves the Court to strike numerous exhibits and documents attached to Defendant's memorandum in opposition.  (Doc. # 69 at 26-30).  The Court did not consider any of the contested exhibits and therefore **DENIES** the SEC's motion to strike as moot.  (Doc. # 69).

**F.      INJUNCTIONS, DISGORGEMENT, AND CIVIL PENALTIES**

The Court will not rule on the SEC's requested remedies at this time, but will instead conduct a hearing on the requested remedies at a future date after the trial concludes.  To facilitate that hearing, the final pre-trial conference scheduled for October 5, 2005 at noon in chambers will also be a status conference.  At that conference, the Court will discuss trial issues and will establish a briefing schedule on the issue of relief and remedies.  The preliminary injunction will remain in full force and effect until after the trial is completed and the Court has issued its ruling on the requested relief and remedies.

**CONCLUSION**

The SEC's motion for summary judgment is **GRANTED** in part and **DENIED** in part. (Doc. # 48).  The only claim that remains is the Exchange Act Section 20(e) aiding and abetting claim against Smith.  The SEC's motion to strike is **DENIED**.  (Doc. # 69).

---

[3] The Court sees no conflict with this holding and with the Court's holding above that Smith acted recklessly because of the definition of reckless, which lacks a knowledge component and instead only requires "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."

The Court will address the lone motion *in limine* after the time for briefing expires.

(Doc. # 75).

**IT IS SO ORDERED**.


    /s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT COURT**